IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Isaac Bonelli,

          Movant/Defendant,

v.

United States of America

          Respondent/Plaintiff.

No. CV-17-00618-PHX-DJH (BSB)
CR-13-01551-PHX-DJH

REPORT AND
RECOMMENDATION

Movant/Defendant Isaac Bonelli (Defendant), has filed a Motion to Vacate, Set Aside, or Correct Sentence by a person in Federal Custody pursuant to 28 U.S.C. § 2255. (Doc. 1.)[1] Respondent/Plaintiff, the United States of America (the government), has filed a response asserting that the § 2255 motion should be denied, and Plaintiff has filed a reply. (Docs. 15, 28.) As set forth below, the Court recommends that the § 2255 motion be denied.

I.     Procedural Background

On November 6, 2013, a federal grand jury indicted Defendant on one count of felon in possession of firearms, in violation of 18 U.S.C. § 922(g)(1) (Count One), one count of prohibited possessor in possession of firearms, in violation of 18 U.S.C. § 922(g)(4) (Count Two), and one count of theft from federal firearm licensee, in violation of 18 U.S.C. § 922(u) (Count Three). (CR Doc. 1, 8.) The Indictment also

---

[1] Citations to "Doc." are to filings in CV-17-618-PHX-DJH (BSB). Citations to "CR Doc." are to filings in CR-13-01551-PHX-DJH.

included a forfeiture allegation pursuant to 18 U.S.C. § 924(d). (CR Doc. 8.) Before trial, the Court granted the government's motion to dismiss Count One. (CR Docs. 57, 60.) The Court also granted Defendant's motion for separate trials and bifurcated Counts Two and Three. (CR Docs. 52, 87.) The charges were based on the theft of a gun from a Walmart store in October 2013. (Doc. 15 at 2-4.) Following a jury trial, Defendant was convicted of Count Three. (Tr. 5/7/15 at 443; CR Doc. 154 at 47.) On July 7, 2015, Defendant pleaded guilty without a plea agreement to Count Two. (Doc. 15, Ex. E; CR Doc. 15.)

Defendant appealed to the Ninth Circuit Court of Appeals and raised the following issues: (1) the court erred by permitting the introduction of prejudicial facts and information; (2) the court erred by permitting an ATF agent to testify as an "expert" regarding the jurisdictional element of Count Three; (3) the court erred because the Rule 11 colloquy did not establish that Defendant's guilty plea was not the result of force, threats, or promises; and (4) the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to preserve video evidence. (Doc. 15, Ex. A.) The Ninth Circuit affirmed Defendant's conviction and sentence. (CR Doc. 158.)

On February 28, 2017, Defendant filed the pending § 2255 motion. (Doc. 1.) Defendant asserts three grounds for relief: (1) trial counsel was ineffective for advising Petitioner to plead guilty to Count Two; (2) Petitioner's guilty plea to Count Two was involuntary, unintelligent, and unknowing; and (3) trial counsel was ineffective for failing to interview two witnesses before trial. (*Id.* at 5-7.) In response, the government argues that the Court should deny relief because Grounds One and Three lack merit and Ground Two is barred from review. (Doc. 15.)

**II.   Ineffective Assistance of Counsel Standard**

In Grounds One and Three Defendant asserts claims for ineffective assistance of counsel. Therefore, the Court first addresses the standard that applies to such claims. To obtain relief for a claim of ineffective assistance of counsel, a defendant must show both that counsel's representation fell below an objective standard of reasonableness, and that

counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687-88, 692 (1984). When reviewing counsel's performance, the court engages a strong presumption that counsel rendered adequate assistance and exercised reasonable professional judgment. *Id.* To show prejudice, a petitioner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 691-92. The court need not address both *Strickland* requirements if the petitioner makes an insufficient showing on one. *See Strickland*, 466 U.S. at 697 (explaining that "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed."); *Rios v. Rocha*, 299 F.3d 796, 805 (9th Cir. 2002) (stating that "[f]ailure to satisfy either prong of the *Strickland* test obviates the need to consider the other") (citing *Strickland*, 466 U.S. at 688).

The negotiation of a plea bargain is "'a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel.'" *Missouri v. Frye*, 566 U.S. 134, 141 (2012) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 366, (2010)). If counsel has misadvised a defendant about the law during a plea negotiation, or improperly coerced a defendant to accept a plea bargain, counsel's performance may be found deficient. *See Lafler v. Cooper*, 566 U.S. 156, 163 (2012) (counsel's erroneous legal advice about possibility of conviction that led to rejection of plea offer constituted deficient performance). To satisfy *Strickland's* prejudice prong when a petitioner has pleaded guilty, he must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985) (citations omitted).

**III.    Ground One**

In Ground One, Defendant argues that trial counsel was ineffective for advising him to plead guilty to Count Two of the Indictment, which alleged a violation of 18 U.S.C. § 922(g)(4). (Doc. 1 at 5; CR Doc. 8.) Defendant argues that § 922(g)(4), which prohibits any person "who has been committed to a mental institution" from possessing

firearms, did not apply to him at the time of the conduct alleged in the Indictment. Defendant asserts that "his disability imposed through a commitment to a mental institution was relieved via an unconditional release from treatment and commitment on July 9, 2013 . . . and by virtue of State authority under relief from disability pursuant to requirements of an act of Congress." (Doc. 1 at 5.)  Therefore, he asserts that he was not a prohibited possessor of firearms and his counsel erroneously advised him to plead guilty to Count Two of the Indictment. (*Id*.)

In his reply, Defendant further argues that counsel was ineffective for failing to investigate, which led to counsel's failure discover that on July 9, 2013 the Psychiatric Security Review Board (PSRB) had issued an order of unconditional release. (Doc. 1 at 5; Doc. 28 at 4.)  Although Defendant characterizes Ground One as an ineffective assistance claim based on counsel's failure to investigate, the Court construes Ground One as an ineffective assistance claim based on counsel's failure to understand the legal significance of the July 9, 2013 order, which resulted in erroneous advice that Defendant plead guilty to violating § 922(g)(4).  As set forth below, the Court finds that Defendant's rights to possess a firearm had not been restored before October 2013, the time of the events alleged in Count Two of the Indictment and, therefore, he was a prohibited possessor under § 922(g)(4).  Based on this finding, the Court concludes that counsel did not fail to understand the legal significance of the July 9, 2013 order, and did not provide erroneous advice to Defendant about the effect of that order.  Therefore, counsel's performance in advising Defendant to plead guilty to Count Two of the Indictment was not deficient.

### A.     Relevant State and Federal Proceedings

On July 20, 2002, law enforcement in Tucson, Arizona responded to a report that Defendant was "on top of a hill dancing with a rifle."  (Doc. 15, Ex. B at 11-13.)  When the Pima County Sheriff's Department arrived, Defendant fired an AK-47 rifle at the deputies. (*Id*.)  Defendant struck one deputy with a bullet and continued to fire at other deputies as they arrived at the scene. (*Id*.)  After the incident, Defendant stated that he

opened fire because he believed he was a soldier and that he was under fire from NATO forces. (*Id*. at 12.)

On November 15, 2002 in the Pima County Superior Court, Defendant pleaded "guilty except insane" to two counts of aggravated assault with a deadly weapon, a class three felony. (*Id**.* at 5.) On December 13, 2002, at the sentencing hearing, the court concluded that Defendant presented a substantial threat of danger or serious physical injury. (Doc. 15, Ex. C at 3.) Based on that finding, and pursuant to Ariz. Rev. Stat. § 13-3994(D)-(P), the state court placed Defendant under the jurisdiction of the PSRB for two consecutive terms of seven-and-one-half years, beginning on December 13, 2002 and ending on December 13, 2017. (*Id*. at 7-8; Doc. 15, Ex. D.) The court issued a commitment order and a minute entry setting forth Defendant's sentence and ordering the Pima County Sheriff to transport Defendant "to the Arizona State Hospital [ASH] as soon as practicable." (Doc. 15, Ex. D.)

On July 6, 2010, the PSRB issued an order of conditional release pursuant to Ariz. Rev. Stat. § 13-3994. (Doc. 28, Ex. C.) In that order, the PSRB stated that it had conducted an administrative hearing and conditionally released Defendant to the community subject to several conditions. (*Id*.) The order further stated that Defendant was receiving mental health treatment and could be returned to the state mental health facility at any time if he violated the conditions of release or if his mental health deteriorated. (*Id*.) The order included outpatient treatment plans and stated that the PSRB retained jurisdiction over Defendant. (*Id*.)

On July 9, 2013, the PSRB issued an "Order of Release pursuant to [Ariz. Rev. Stat.] § 13-3994(F)(2)." (Doc. 1 at 5; Doc. 28, Ex. A.) The order stated that the PSRB determined that Defendant "no longer suffer[ed] from a mental disease or defect and [was] not dangerous." (Doc. 28, Ex. A.) The PSRB released Defendant from the terms of the conditional release order. (*Id*.) The PSRB stated that it "continue[d] to have jurisdiction over [Defendant] until December 13, 2017, pursuant to [Ariz. Rev. Stat.] § 13-3994(D)." (*Id*.)

In a statement signed under the penalty of perjury, which is attached to Defendant's reply, Carol K. Olson, M.D., stated that she served on the PSRB and signed the order of unconditional release in June 2013 "and later requested the Court to issue a warrant to return [Petitioner] to ASH following his arrest for committing new crimes within three months of his unconditional release."[2]    (Doc. 28, Ex. B at ¶¶ 3, 20.) Dr. Olson explained that the state court placed Defendant "under the jurisdiction of the PSRB pursuant to the Arizona GEI [guilty except insane] statute, [Ariz. Rev. Stat.] § 13-3994 for a term of fifteen years."  (*Id*. at ¶ 8.)  Dr. Olson further explained that "GEI patients committed to the PSRB's jurisdiction would remain committed to the Arizona State Hospital" until the PSRB determined that the patient was no longer suffering from a mental disease or defect and was not dangerous.  (*Id*. at ¶ 9.)  Dr. Olson then explained the procedures by which the PSRB makes release decisions for patients committed to the ASH.  (*Id*. at ¶¶ 10-14.)  Finally, Dr. Olson explained that an unconditional release is a termination of all treatment and conditions to which the GEI patient is subject.  (*Id*. at ¶ 17.)

Within approximately three months of the July 9, 2013 order of release, in October 2013, Defendant was involved in the theft of a gun from a Walmart store, as alleged in the Indictment.  (Doc. 15 at 2-4.)  As previously stated, on July 7, 2015, Defendant pleaded guilty in this Court to Count Two of the Indictment, which charged him with violating 18 U.S.C. § 922(g)(4).  (CR Doc. 50.)  To establish a violation of § 922(g)(4), the government must prove that the defendant had "been committed to a mental institution."  *See* 18 U.S.C. § 922(g)(4).  At the change of plea hearing, the Court asked Defendant: "And do you also agree that the government could still prove that you had been previously committed to a mental institution and that you are still under the jurisdiction of the Arizona Psychiatric Review Board, which will expire in 2017."

---

[2] Dr. Olson's statement was originally filed in *Bonelli v. Mulla*, a civil rights action pursuant to 42 U.S.C. § 1983.  (*See* CV 14-406-PHX-SPL (BSB), Docket 160-1 at 148-152.)  In that case, the Court granted summary judgment in favor of defendants and that decision is currently on appeal.  (*Id*. at Docs. 201, 202, 205.)

(Doc. 15, Ex. E at 49.)  Defendant responded: "Yes, your honor.  At the time I was under the jurisdiction of the Psychiatric Security Review board with jurisdiction expiring on December 13th, 2017."  (*Id*.)   The Court found that "the defendant's plea [was] knowingly, intelligently, and voluntarily made and there [was] a sufficient factual basis for it." (Doc. 15, Ex. E at 51.)

### B.    Statutory Background

Under § 922(g)(4) of the Gun Control Act, it is unlawful for any person "who has been adjudicated as a mental defective or who has been committed to a mental institution" to purchase or possess a firearm.  18 U.S.C. § 922(g)(4).  Federal regulations define "[c]ommitted to a mental institution," in part, as "[a] formal commitment of a person to a mental institution by a court . . . includ[ing] a commitment to a mental institution involuntarily. . . . [and] commitment for a mental defectiveness or mental illness."  27 C.F.R. § 478.11.  The government argues that the state court's December 2002 order of commitment satisfied the element of the offense that Defendant had been "adjudicated as a mental defective" or had been "committed to a mental institution." (Doc. 15 at 13.)  Thus, the government argues that "[t]he only question before this Court is if Defendant was committed to a mental institution." (*Id*. at 17.)   The government further argues that "it is immaterial that [Defendant] was conditionally released in 2010." (*Id*.)

Defendant, however, "does not deny that he was once committed to a mental institution." (Doc. 28 at 3.)  Rather, he argues that § 922(g)(4) did not apply to him in October 2013 because, on July 9, 2013, the PSRB issued an order of release pursuant to Ariz. Rev. Stat. § 13-3994(F)(2).  (Doc. 1 at 5; Doc. 28 at 3, Ex. A.)  Liberally construing Defendant's § 2255 motion, he argues that the order of release was issued pursuant to a state relief-from-disabilities program, as authorized by the NICS Improvement Amendments Act of 2007 (NIAA), Pub. L: No. 110-180, §§ 103, 105 122 Stat. 2559 (2008).[3]   Therefore, he argues that, as of July 13, 2013, he was permitted to possess

---

[3] NICS refers to the National Instant Criminal Background Check System.

firearms and was not in violation of § 922(g)(4) at the time of the conduct alleged in Count Two of the Indictment.  (Doc. 1 at 5.)  The government does not respond to Defendant's argument that the July 9, 2013 order of release restored his rights and therefore he was no longer a prohibited possessor at the time of the events charged in the Indictment.

Instead, the government notes that § 925(c) of the Gun Control Act provides for a relief-from-disability program to be administered through the Attorney General. (Doc. 15 at 13 n.7, & 16.)  The government asserts that "[t]his is the rehabilitative procedure available under federal law," and that Defendant did not seek relief under this procedure.  (*Id*. at 13 n.7, & 16.)  However, "[t]his program was defunded in 1992." *See Mai v. United States*, 2018 WL 784582, at *2 (W.D. Wash. Feb. 8, 2018); *see also Tyler v. Hillsdale Cty. Sheriff's Dept.*, 837 F.3d 678, 682 (6th Cir. 2016) (en banc) ("Section 925(c) is currently a nullity.  Congress defunded the relief-from-disabilities program in 1992.") (citing *United States v. Bean*, 537 U.S. 71, 75 n.3 (2002).)

In 2008, however, Congress passed the NIAA.  *Mai*, 2018 WL 784582, at *2; *Tyler*, 837 F.3d at 682-83.  The NIAA authorizes federal grants to states to help them identify which individuals are eligible to purchase and possess firearms and to help them provide accurate information to federal databases.  *Mai*, 2018 WL 784582, at *2; *Tyler*, 837 F.3d at 682-83.  "To be eligible for these grants, a state must certify to the Attorney General that it has implemented a relief-from-disabilities program under which an individual who, pursuant to state law, has been adjudicated 'mentally defective' or has been 'committed to a mental institution' may apply for 'relief from the disabilities imposed' by 18 U.S.C. § 922(g)(4)."  *Mai*, 2018 WL 784582, at *2 (citing Pub. L. No. 110-180, §§ 103-105, 121 Stat. 2559, 2568-69 (2008).)

Defendant argues that he is entitled to relief based on the NIAA.  (Doc. 1 at 5; Doc. 28 at 4.)  Defendant relies on a provision in the NIAA that applies to federal departments and agencies that are responsible for adjudication of mental health issues. (Doc. 28 at 4-5 (citing NIAA§ 101(c)(1)(A)).  Pursuant to that provision, "the department

or agency may not submit an individual's name into the NICS registry if 'the adjudication or commitment, respectively, has been set aside or expunged, or the person has otherwise been fully released or discharged from all mandatory treatment, supervision, or monitoring.'" NIAA § 101(c)(1)(A)). When these criteria are met, "the agency or department does not submit the individual's name into the NICS register, 'and the adjudication or commitment, respectively, shall be deemed not to have occurred for purposes of subsections (d)(4) and (g)(4) of section 922 of title 18, United States Code.'" *United States v. Allen*, 2016 WL 4146074, at *6 (quoting NIAA § 101(c)(2)(B)). This provision, however, "applies to federal departments and agencies that are responsible for adjudication of mental health issues." *Allen*, 2016 WL 4146074, at *6. Therefore, this provision does not apply to Defendant, who was adjudicated as mentally deficient and committed to a mental institution in state court.

However, the NIAA provides similar relief for those adjudicated mentally deficient in state proceedings. *Id*. In states "that have complied with the NIAA and provided citizens an opportunity to petition to have their rights reinstated, the citizens who petition and are granted relief are given full recognition under federal law:" *Id*. (quoting NIAA § 105(b)). In Arizona, "a person may petition the court that entered an order, finding or adjudication that resulted in the person being a prohibited possessor . . . subject to 18 [U.S.C.] § 922(d)(4) or (g)(2) to restore the person's right to possess a firearm." Ariz. Rev. Stat. § 13-925(A). The statute sets forth the procedures for a person to petition for a restoration of his right to possess a firearm, including the evidence the court must consider at a hearing on the petition, the petitioner's burden of proof, and the requirement that, at the conclusion of the hearing, the court issue findings of fact and conclusions of law. *Id*. at § 13-925(B)-(E). The statute further provides that "[i]f the court grants the petition, the original order, finding or adjudication is deemed not to have occurred for purposes of applying . . . 18 [U.S.C.] § 922(d)(2) or (g)(4) to that person." *Id*. at § 13-925(F). Finally, the statute provides that if the court grants the petition, the state will remove the person's record from the database provided to the NCIS, and notify

the United States Attorney General that the person is no longer a prohibited possessor. *Id.* at § 13-925(H).

Defendant does not assert that he filed a petition to restore his right to possess a firearm in state court, pursuant to § 13-925.  Instead, he argues that the PSRB's July 9, 2013 order of release was an "administrative action" that relieved him of his firearms disability because it relieved him from the terms of the July 6, 2010 order of conditional release, which included a condition that he not own or possess a firearm.  (Doc. 28 at 6 (citing Ex. A at ¶ 2, Ex. C at ¶ P).)  Thus, he concludes that the PSRB's July 9, 2013 order of release, which was issued explicitly "pursuant to [Ariz. Rev. Stat.] § 13-3994(F)(2)," is equivalent to an order restoring a person's right to possess a firearm and should be considered an order issued pursuant to a state relief-from-disabilities program, as authorized by the NIAA.

Defendant's argument fails because the statutory basis for the PSRB's July 9, 2013 order of release, § 13-3994, addresses the procedures for a person who has been found guilty except insane, and committed to a secure state mental health facility, to petition for conditional or unconditional release from that facility.  *See* Ariz. Rev. Stat. § 13-3994(A)-(R).  This statute also provides that when a state court places a GEI person under the jurisdiction of the PSRB, the court shall determine the length of the PSRB's jurisdiction over the person, the PSRB shall consider petitions for the person's release from confinement at a secure state mental health facility, but the court "shall retain jurisdiction of all matters that are not specifically delegated to the [PSRB] for the duration of the presumptive sentence." *Id.* at § 13-3994(D) and F).  This statute does not delegate to the PSRB the state court's authority to determine petitions to restore rights to possess firearms under § 13-925.  Furthermore, the Arizona statutes define a "prohibited possessor" as a person "whose right to possess a firearm has not been restored pursuant to § 13-925." *See* Ariz. Rev. Stat. § 13-3101(A)(7).

Thus, under the Arizona statutes, Defendant was required to file a petition to restore his right to possess a firearm pursuant to § 13-925.  The PSRB's orders, issued

pursuant to § 13-3994 and addressing his conditional and unconditional release from conferment to a secure state mental facility, did not restore his rights to possess a firearm. Therefore, these orders were not issued as part of a state relief-from-disabilities program under the NIAA § 105, and they did not grant the relief of deeming Defendant's 2002 order of commitment as not having occurred for purposes of § 922(g)(4).  *See* NIAA § 105(b), Pub. L: No. 110-180, § 105, 122 Stat. 2559 (2008).

Therefore, in October 2013, at the time of the events alleged in the Indictment, Defendant was a prohibited possessor under § 922(g)(4) as a person who had "been adjudicated as a mental defective or who has been committed to a mental institution," and whose right to possess a firearm had not been restored under a state relief-from-disabilities program.  Thus, the Court rejects Defendant's claim that he received ineffective assistance because counsel did not understand the legal significance of the July 9, 2013 order of release and thus erroneously advised him to plead guilty to Count Two of the Indictment.  Ground One of the § 2255 motion fails.

## IV.    Ground Two

In Ground Two, Defendant argues that his guilty plea to being a prohibited possessor in violation of § 922(g)(4), as alleged in Count Two of the Indictment, was involuntary, unintelligent, and unknowing.[4]  (Doc. 1 at 6.)  Defendant argues that his guilty plea was based on "misinformation" because defense counsel did not understand the "true nature and legal weight" of the PSRB's July 9, 2013 unconditional release order.  (*Id*.)  Defendant's argument in Ground Two, like his argument in Ground One, is based on his assertion that as a result of the PSRB's July 9, 2013 order of release, he was not a prohibited possessor at the time of the events alleged in the Indictment, that defense counsel did not understand the legal significance of the July 9, 2013 order of release, and

---

[4]  The government argues that review of Ground Two is procedurally barred because Defendant could have raised that claim on direct appeal.  (Doc. 15 at 9-10.) Regardless of whether Ground Two is procedurally barred, Defendant is not entitled to relief on Ground Two because it lacks merit.  *See* 28 U.S.C. § 2255.

thus misinformed him that he was a prohibited possessor under § 922(g)(4).  (Doc. 1 at 6.)

The *Strickland* test applies to a defendant's challenge of his guilty plea based upon ineffective assistance of counsel.  *Washington v. Lampert*, 422 F.3d 864, 872 (9th Cir. 2005) (citing *Hill*, 474 U.S. at 59).  In this context, "the ineffectiveness inquiry probes whether the alleged ineffective assistance impinged on the [petitioner's] ability to enter an intelligent, knowing and voluntary plea of guilty." *Lambert v. Blodgett*, 393 F.3d 943, 980 (9th Cir. 2004).  Here, as discussed above in Section III, at the time of the incidents alleged in the Indictment, Defendant was a prohibited possessor under § 922(g)(4).  Therefore, assuming that defense counsel advised Defendant that the charged conduct violated § 922(g)(4), that advice did not misinform Defendant.  Accordingly, Defendant has not established his claim that his guilty plea to that charge was involuntary because it was based on misinformation provided by defense counsel.

Additionally, Defendant's claim regarding the voluntariness of his guilty plea is not supported by the record.  As the change-of-plea proceeding reflects, United States District Judge Diane J. Humetewa addressed Defendant in open court regarding his guilty plea asked numerous questions to ensure Defendant's plea was valid and voluntary.  (CR Doc. 155 at 34.)  The change-of-plea proceeding is replete with responses by Defendant demonstrating that he understood the consequences of pleading guilty, and that he did so voluntarily.  (*Id*. at 34-52.)  Defendant does not challenge his statements made in court or the factual basis for his guilty plea.  (Doc. 28 at 10.)  The record reflects that Defendant's guilty plea was knowingly and voluntarily made.  Therefore, Defendant is not entitled to relief on Ground Two.

**V.     Ground Three**

In Ground Three, Defendant argues that defense counsel was ineffective for failing to interview Amy Charles and Tim Ham before trial, which led to no cross-examination of Charles and inadequate cross-examination of Ham.  (Doc. 1 at 7.)  Defendant contends that he was prejudiced by counsel's failure to effectively cross-examine the witnesses to

- 12 -

impeach their identifications of Defendant.  Defendant argues that, but for trial counsel's deficient performance related to those witnesses, there is a reasonable likelihood he would not have been found guilty of Count Three.  (*Id*.)

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Strickland*, 466 U.S. at 691.  "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  *Id.*  The Court does not need to determine whether trial counsel performed deficiently by failing to interview Charles and Ham because, as set forth below, Defendant has not shown that he was prejudiced by trial counsel's alleged deficient performance.  *See Rios*, 299 F.3d at 805.

The record reflects that defense counsel cross-examined Ham about his identification of Defendant.  (Doc. 15, Exs. F, G.)[5]  Ham testified that the man who quickly entered the store, grabbed a reusable shopping bag, then quickly left the store ten minutes later after giving him a false receipt, was in his mid-20s-to-30s, between 6' and 6'2'' tall, Caucasian, very skinny, dark hair, had an unkempt beard, and was wearing a baseball cap, jeans, and dark-colored clothes.  (RT 5/5/15 155-56, 169.)  Defense counsel cross-examined Ham.  (*Id*. at 164-70.)  She inquired about Ham's ability to see the person he had identified as Defendant, including that Ham was near sighted and wore glasses.  (*Id*. at 166.)  Ham also agreed that the individual he saw was wearing a baseball cap with the "bill down [slightly] over their forehead."  (*Id*. at 168-69.)  Ham testified that he was only 2 to 2 ½ feet away from Defendant when he asked Defendant for a receipt and Defendant handed him one.  (*Id*. at 169.)  Ham affirmed that this exchange only lasted for a matter of "seconds," and the individual's "head was always down."  (*Id*. at 169-70.)

---

[5] Exhibits F and G contain excerpts from the transcripts of the criminal proceedings that took place on May 5 and 6, 2015.  (Doc. 15, Exs. F, G.)  The complete transcripts are located at CR Doc. 152 and 153.  The Court cites to those copies of the transcripts at RT 5/5/15 and TR 5/6/15.

Charles testified that she could see Defendant "pretty clearly" and similarly described him as being in his late 20s or early 30s, skinny, pale, with dark hair and a lot of dark facial hair.  (RT 5/6/15 208.)  Defense counsel did not cross-examine Charles.  (*Id*. at 218.)

Ham's and Charles' descriptions of the individual they identified as Defendant matched the individual shown in the surveillance videotapes and still pictures, and Ham and Charles identified Defendant in the still photographs taken from the surveillance camera when he was exiting Walmart.  (RT 5/5/15 162-63; RT 5/6/15 217-18.)  They also identified Defendant physically in court as the man they had seen on the night of the incident in Walmart.  (RT 5/5/15 161-62; Doc. 15, RT 5/6/15 211.)

In addition to Ham and Charles, other witnesses established Defendant's identity.  The crime analyst testified that Defendant's fingerprint was found on the inside of the glass case that had contained the stolen firearm.  (RT 5/6/15 346-47, 366-67.)  The location of the fingerprint matched the location, shown on the surveillance videotapes, where Defendant was touching the inside of the glass case. (*Id.* at 283-84.)  Additionally, the shoplifter gave Ham a receipt from a nearby restaurant, which was time-stamped four hours earlier and had Defendant's name on it along with the last four digits of his credit card number.  (*Id*. at 211, 286)  When Defendant was arrested three days later, agents recovered another receipt from his backpack that had the same last four digits of the credit card number on it.  (*Id*. at 379.)

Considering the evidence at trial that supported Ham's and Charles' identification of Defendant as the perpetrator, even assuming trial counsel performed deficiently by failing to interview Ham and Charles before trial, Defendant has not shown that but for trial counsel's deficient performance there is a reasonable likelihood that that the result of the proceeding would have been different.  *See Strickland*, 466 U.S. at 697; *Rios*, 299 F.3d at 805.  Therefore, Defendant is not entitled to relief on Ground Three.

///

///

## VI.   Conclusion

Defendant has failed to establish that he is entitled to § 2255 relief.  Therefore, the Court recommends that the § 2255 motion be denied.

Accordingly,

**IT IS RECOMMENDED** that the Motion to Vacate, Set Aside, or Correct Sentence (Doc. 1) be **DENIED**.

**IT IS FURTHER RECOMMENDED** that a Certificate of Appealability and leave to proceed *in forma pauperis* on appeal be **DENIED.**

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of the District Court's judgment.  The parties shall have fourteen days from the date of service of a copy of this recommendation within which to file specific written objections with the Court.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6, 72.  The parties have fourteen days within which to file a response to the objections.  Failure to file timely objections to the Magistrate Judge's Report and Recommendation may result in the acceptance of the Report and Recommendation by the District Court without further review.  *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003).  Failure to file timely objections to any factual determinations of the Magistrate Judge may be considered a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation.  *See* Fed. R. Civ. P. 72.

Dated this 7th day of March, 2018.

_____
Bridget S. Bade
United States Magistrate Judge